## Keiffer v. Louisville & Nashville Railroad Co.

(Decided April 28, 1911.)

### Appeal from Warren Circuit Court.

Laws of Foreign State—Must be Proven—Reversal for Substantial Errors.—We do not take judicial knowledge of the law of another State. What is the law of another State is a fact to be shown by the evidence and we must decide the case upon the evidence in the record. A judgment should not be reversed except for substantial errors.

WRIGHT & McELROY, PROCTER & HERDMAN and R. L GREENE for appellant.

SIMMS, DuBOSE & RODES and BENJAMIN D. WARFIELD for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

This is the second appeal of this case. The opinion on the former appeal is found in 132 Ky., 419. It was there held that the trial judge should have peremptorily instructed the jury to find for the defendant, as, under the state of facts proven, plaintiff failed to make out a case. The facts are fully stated in that opinion.

Upon the last trial the evidence as to how the collision occurred was practically the same as upon the former trial, and at the conclusion thereof the court instructed the jury to find for the defendant, which was done. Plaintiff appeals.

The chief ground relied upon for reversal is the failure of the trial court to permit the depositions of three Tennessee lawyers to be read to the jury. These depositions are in the record. No exceptions were filed to them, and the trial court must have rejected them because he regarded them as irrelevant or incompetent. In the former opinion it is stated that:

"By the law of Tennessee, the men on one train in the service of the railroad are fellow-servants of the men on another train, and no recovery can be had by one for an injury due to the negligence of the other."

Plaintiff's counsel interpreted this language to mean that he must lose his case unless he could show that the law of Tennessee was different from what it was proven to be on the former trial, and hence he offered the depositions in question.

Technically speaking, the court should have permitted these depositions to be read, for, as said by this court in P. C. C. & St. L. R. R. Co. v. Austin's Admr., 141 Ky., 722:

"We do not take judicial knowledge of the law of another State. What is the law of another State, is a fact to be shown by evidence, and we must decide the case upon the evidence in the record on the subject. (Union Central Life Insurance Co. v. Dukes, 132 Ky., 370; L. & N. R. R. Co. v. Smith, 135 Ky., 462; Yellow Poplar Lumber Co. v. Ford, 141 Ky., 5.) If the Supreme Court of Indiana in its later opinions has relaxed the rule laid down in its earlier opinions, appellee should introduce evidence to show this. A court of this State cannot go through all the decisions of the Supreme Court of another State and determine for itself what the law of that State is. When a witness is introduced in a case

pending here, and states that certain opinions of the Supreme Court of another State establish a certain proposition, as the proper construction of a writing is a question for the court, not the jury, the court trying the case may read these decisions itself and determine their effect. But it cannot disregard the conclusion of the witness when it has not before it the facts upon which the witness bases his conclusion. When a witness testifies to the law of another State, he may be required on cross-examination to state on what decisions of the Supreme Court of the State or other authority he bases his judgment, and to file with his deposition copies of the opinion or authority relied on. When the witness refers to the opinions of the Supreme Court of another State as the basis for his conclusion, and files a copy of the opinions with the deposition, or where the books are accessible to the trial court, and by consent of parties he gives the style of the case and page of the book where it is found, then the court trying the case may read the opinion or opinions so designated, and see if they support the conclusion of the witness. Where the testimony is conflicting as to what the law of another State is, and the witnesses reaching conflicting conclusions, give the opinion of the State Court on which their conclusions are based, a court of this State may, in an action pending here, read the opinion so designated for itself, and determine what is the proper construction to be placed upon them. In such an event the court should instruct the jury as to the law of the case just as he would instruct the jury as to the law of the case when governed by the laws of this State. In other words, the court must then determine what the law of the other State is by reading the indicated opinions themselves, and tell the jury what is the law of the case. (2 Wharton Conflict of Laws, Sec. 773.)"

The foregoing excerpt from the Austin case is the latest enunciation of this court upon the subject, and while that opinion was subsequently withdrawn, it was upon a question of practice, which in no wise affected the question under consideration.

An examination of these depositions shows that, in all material respects, the law of Tennessee is as proven before, and the trial court, evidently having reached this conclusion, rejected them. If he had permitted them to be read he would have had to pass upon their sufficiency and determine whether or not they showed the law of that

State to be different from what it had been proven to be upon the last trial. In order to determine whether or not they should be read to the jury, he considered them, and was of opinion that the Tennessee cases cited by these witnesses confirmed, rather than overthrew, the statement of the Tennessee law as found in the former opinion. Hence it would have been but idle form to have permitted the depositions to be read. A judgment should not be reversed except for substantial errors.

Much time and consideration is given by counsel in an effort to show either that the leaky engine or the failure or neglect of the company to notify those in charge of Keiffer's train of the breakdown of the train in front of them was the proximate cause of his injury. On practically the facts presented in this record, upon the former appeal, we said that the leaky engine was not the proximate cause, but that it was either the negligence of the flagman on the first train or that of Keiffer and his associates on the second train; and, under the rule repeatedly announced by this court, that opinion is the law of this case, and we will not again enter upon a consideration of those questions, as they are settled. Gray Tie & Lumber Co. v. Farmers Bank, 24 Rep., 2319; Wilson's Assignees v. Louisville Banking Co., 25 Rep., 1065; Fidelity & Deposit Co. of Md. v. Same, Id.; A. Booth & Co. v. Bethel, 25 Rep., 1747.

Under the former opinion, plaintiff, in order to have his case submitted to the jury, must have presented either a different state of facts, or shown that the law of the State of Tennessee upon the same state of facts was different from what it was proven on the former trial. The evidence presented met neither of these necessary prerequisites, and the judgment is, therefore, affirmed.

Judge Nunn dissenting; Judge Settle not sitting.


Dissenting opinion by Judge Nunn.

This is the second appeal of this case. The opinion on the first appeal may be found in 132 Ky., 419; 113 S. W., 433. It will be observed that appellant alleged in his petition, in substance, that appellee and its agents and servants with gross negligence caused the track to be obstructed with a leaky and defective engine; that defendant, appellee now, was guilty of gross negligence in fail-

ing to notify appellant that the engine was defective and unable to make its proper time and usual rate of speed and that it was behind its usual time; that it did with gross negligence fail to take any precaution to protect him and to provide for his safety; that he was furnished defective oil for signal lights; that the flagman was incompetent, and that his injuries were received as the direct and natural result of the gross negligence of appellee and its agents. These allegations were denied, a plea of contributory neg-. ligence was interposed and the law of Tennessee was alleged to be, in substance, that although appellee's agents and servants in charge of the train with which appellant's train collided, were negligent and produced the collision and appellant's injuries, they were his fellow servants and their negligence was among the risks he assumed when he accepted employment of appellee, and it was not, therefore, responsible to him for damages on account thereof.

The first trial resulted in a verdict for $16,000 in behalf of Keiffer, but was set aside by the lower court. On the second trial he recovered a verdict for $25,000 upon which the lower court rendered judgment, but it was reversed upon appeal to this court. (L. & N. R. R. Co. v. Keiffer, supra.) It will be noticed that the case was reversed for the reason that the evidence appearing in the record on that appeal, showed, according to the Tennessee Law, that the servants on Keiffer's train and those in charge of the train collided with, were fellow-servants. It was also determined that the servants in charge of the train collided with were negligent in failing to notify appellant of the delay of it, but that, as they were fellow-servants with those in charge of Keiffer's train, Keiffer could not recover for their negligence. The court also decided that according to the testimony before it on that trial, appellant was guilty of contributory negligence which helped to produce his injuries; that his contributory negligence consisted in approaching Big Sandy at too high rate of speed and in colliding with the other train. It was further decided that the leaky engine was not the proximate cause of his injuries.

After the mandate of this court was issued and filed, another trial was had in the lower court upon the same issues, and it resulted in a peremptory instruction in be-

half of appellee. Appellant offered to read the depositions of Tennessee lawyers, with reference to the law of that State upon the issues involved, but the lower court sustained objections to them because it conceived the idea that the former opinion was res adjudicata of that question, and, it seems, that he gave the peremptory instruction upon the idea that the former opinion was a bar to a further maintenance of this case. The lower court seems to have misconceived the effect of the former opinion. In the case of L. & N. R. R. Co. v. O'Nan's Admr., ———., ———; 119 S. W., 1193, this court said:

"When a case is once before the appellate court, what is then said with respect to the law applicable to it is to be thereafter deemed the law of the case, binding alike upon the appellate court and the trial court. This depends, of course, upon whether substantially the same facts are made to appear on the subsequent trial; for it is recognized that the law varies or may vary according as the facts vary. If, therefore, the facts developed on the second trial are materially different upon any controlling issue from the aspect presented by the former record, the law may be also different."

In extending the opinion in the case of L. & N. R. R. Co. v. Irby, By, et al., 142 Ky., 273, the court said:

"Appellant filed a petition for a modification of the opinion in this case and insists that the court misconstrued the testimony as to whose duty it was to give the signal for the separation of the cars at the time Irby was injured. Conceding this to be true, which we do not decide, the case is not to be tried upon the testimony of the last trial, but is to be governed by the testimony on the future trial, and if there should be a conflict on this point, then the court should also submit that issue to the jury."

The law being as stated in the two above quotations, it becomes necessary to see to what extent the testimony on the last trial of this case differs from that produced upon the former trial, if any. Appellee did not produce any proof upon the last trial, but upon the former trial it had proof as to the law of Tennessee showing that the servants in charge of the train collided with, were fellow-servants of appellant. It also had evidence upon that trial which tended strongly to show that appellant was guilty of contributory negligence in managing his train, and also evidence of facts which, according to the Ten-

nessee law, showed that the leaky engine was not the proximate cause of appellant's injuries. As stated, there was no testimony introduced upon the last trial upon any of these points. Appellant offered to introduce the depositions of three Tennessee lawyers which tended to show that appellant could recover for the negligence of appellee in furnishing a leaky engine and not giving appellant notice that it was ahead of him in that condition. So we have a case before us this time wherein appellee's pleadings allege, as before, that the law of Tennessee was such as to relieve it from all responsibility for appellant's injuries, and an answer denying, in positive terms, that such was the law, without any proof whatever introduced upon that issue. Appellee's counsel strenuously contend that the former opinion by this court is res adjudicata; that this court, having once settled what the law of Tennessee was, which governed the facts shown by the testimony introduced upon the former trial, is forever bound by that opinion. No authorities, however, are cited to support this contention. I have always understood that when a person seeks to reap a benefit from the law of another State, they must plead and prove that law as they would any other fact. The authorities are numerous on this point, but we will cite only one case, C. & N. R. Co. v. Venable, 111 Ky., 41, wherein it is said:

"Where a party seeks to recover or defend under a foreign law, such law must be pleaded and proved like any other fact; but in the absence of averment and proof, the rule is that foreign States, whose system of jurisprudence is derived from the same source as our own, are presumed to be governed by the same law."

There was no testimony introduced in the last trial showing what the law of Tennessee was; therefore, the case must be determined according to the law of this State. I will state the substance of the testimony on the last trial in order to determine whether appellant made out a case. Appellant was engineer on train No. 111, one of the appellee's freight trains which was to run from Bowling Green, Ky., to Paris, Tenn., or further. Train No. 115, consisting of two sections, second and third, left Bowling Green ahead of him. The second section had a leaky engine, but appellant had no information of that fact. When appellant arrived with his train at Erin, Tenn., he and his conductor received orders stating that sections two and three of train No. 115, had

double-headed and would run from there in that shape ahead of appellant's train, No. 111. Appellant arrived at Erin about 11:20 p. m., after train No. 115 had left, but did not leave there until about 2:20 a. m. on account of passing trains. Besides the message mentioned, he had another informing him to look out for a circus train at Paris, Tenn. He had no information of the leaky condition of section two of train No. 115 nor of its delay. The double-header passed on to Big Sandy from Erin, a distance of about twenty-three miles, and was over four hours in making the trip. As stated, appellant left Erin at 2:20 a. m. and arrived at Big Sandy at 3:30 a. m. The railroad track is straight for about a mile before reaching Big Sandy and there is nothing to obstruct the view. Appellant states that he was keeping a lookout at this point; that he saw no train; that there were no markers, or lights, on the rear end of the train he collided with; that upon his approach to Big Sandy he received orders from his conductor to pass that station and go to another six miles ahead to meet another train; that just before he reached the city limits of Big Sandy he saw a white light in the hands of somebody; that this light meant nothing to him, but that just as he was passing the light he saw it reflected through another globe which showed red and indicated to him there was some danger ahead; that he then shut off the steam and set the brakes, but was unable to stop his train before it collided with the double-header and injured him severely. As there was a peremptory instruction given, it is unnecessary to spend time defining the extent of his injuries as shown by the proof. Those in charge of the double-header failed to give appellant any notice of any kind that their train was occupying the track ahead of him, and there were no lights on the rear of their train to enable appellant to discover it in time to prevent the collision. The testimony of the company's witnesses on the former trial showed that appellant approached Big Sandy at too high a rate of speed, and it was upon that evidence that this court said he was guilty of contributory negligence. The testimony upon the last trial, however, shows that he had his train under control for several miles; that it was running at the rate of ten or twelve miles an hour at the time of the accident; that the rules of the company required him to have it under control at that point; that a train is under control when running twelve miles or less

an hour, and the record contains no testimony produced upon the last trial to contradict this. Mr. Tuck, the fireman on the leaky engine of the double-header, stated that it was leaking when they got it in Bowling Green and when they reached Guthrie; that they left Guthrie with a full train, but did not have much steam and had to "just swap" steam for water; that they could not hold up and make any time and keep water in the boiler; that they would have to shut the injector off for a while and run and then put it on again: that they did this to let it catch up steam, and that they stalled at Clarksville on account of the leaky engine; that the third section which was following pushed them over the hill and they stopped at Hematite and cleaned the fire and tried to get things in shape to go ahead; that they stopped again at Cumberland City and put sawdust in the boiler to stop the flues from leaking; that the leaky condition of his boiler was the cause of it being put in with the other section of No. 115 and run as a double-header, at Erin; that after the double-header was made up they broke two draw-heads at Tennessee Ridge; that they were four hours in going from Erin to Big Sandy where they stopped to take water; that they had broken a knuckle of a coupling and their train was in two at the time appellant's train struck it. These questions were asked the witness:

"Q. What sort of a jar was it when Keiffer struck you?"

"A. It was light, it didn't shove the engine more than four feet."

"Q. Do you know whether the markers were burning on the hind end of Rainey's train at Big Sandy?"

"A. No, sir."

Rainey was the conductor in charge of the double-header. This leaky engine was brought to Bowling Green on the evening before appellant's train went out, in a leaky condition, and was reported upon the books of the company and to the persons whose duty it was to repair it. Under this evidence, appellant was not in fault; he knew nothing about the leaky engine; was running his train at less than the usual rate and the rate allowed by the company, when he started down this mile of straight track approaching Big Sandy where the double-header was. Appellant, the fireman and flagman testified that there were no lights on the rear of the

double-header. It was agreed that he was not flagged or given any notice of this train, as required by the rules of the company. Under these facts and the laws of this State, appellant is certainly entitled to recover. See L. & N. R. R. Co. v. Brown, 127 Ky., 732, and the many authorities therein cited.

It is conceded in this case that the law of Tennessee and Kentucky is the same with reference to the duty of the employer in furnishing the employe safe and suitable tracks and machinery to labor with, and that neither State holds that the train dispatcher, the telegraph operator or the conductor was a fellow-servant of Keiffer. As we have seen, appellee placed on the track ahead of appellant's train another train pulled by a leaky engine which gave those in charge of it much trouble, and failed to give appellant any notice of that fact at any time.

Upon the last trial appellee introduced the following order, or message, to- wit:

"Message.                                      Form 133.
        "Louisville & Nashville Railroad Co.
"To 111.                                       8-19, 1904.
      "2nd 115 has instructions to let you by when overtaken. Look out for circus loading at Paris just south of depot.                                      A. B. S.
                                        "J. H. E."

Appellant testified that he did not receive this message and that it was the duty of his conductor, Grady, and also the operator to give him a copy of all train orders governing the movement of his train; that if he had received the message above copied, he would not have been injured; that he would have made inquiry of the operator at Erin or Tennessee Ridge as to the cause of the delay of second 115 and in that way would have found out that it had a leaky engine. He said that if he had received that message it would have been his duty as engineer to make such inquiry, and introduced three other expert engineers who testified to the same thing. Appellee's counsel suggest, in their briefs, that this message is a fake; that no such message was ever issued. The facts with reference to this matter are, in substance, these: The message purported to have been incorporated in the bill of evidence on the former trial, on page 291, and is there just as copied. The official stenographer, Mrs. Galloway, testified that in taking the testimony on

the first trial, the railroad company introduced several messages or orders; that after they were read to the jury the attorneys for the company kept them; that when she was making out the bill of evidence for the Court of Appeals, she went to the attorneys for the company to get these orders to copy into the transcript; that they gave her a bundle of papers which she copied therein and returned the original to the attorneys. She testified that the copies were made with an Oliver Typewriter; that she believes she copied them; that she had no recollection of receiving any papers from any other source during the preparation of that transcript. That transcript was written on white, typewriting paper about ten by twelve inches. The page upon which this message was transcribed is the same as the others, except it has the appearance of having been handled more than the others, and this probably occurred on account of this issue. This sheet appears to have been put into the record as the others were, by placing a cord through the left margin at four points, but is not now fastened therein, but appears to have been pulled out, as the four torn places in the margin are exactly opposite the cords that fasten the record together. Page 292 upon which the other message is copied is in the same condition as 291 and the left hand margins of the two pages are glued together. On page 291, and just below the message copied, appears the following in handwriting:

"Pasted back in this record Nov. 6, 1909, by W. H. Jones.                                W. H. JONES, Clerk."

The fact is, this message was not introduced on the first trial, and if appellant or any one interested with him, mutilated the record and inserted it therein, it was a great crime and they ought to be punished. The more reasonable presumption would be that appellee's attorney had this message during the first trial but did not introduced it, but placed it with the others they had introduced, for safe keeping until the time to make up the bill of evidence and handed it, by mistake, to Mrs. Galloway when she called for the others to copy, and in that way it was inserted in the record. If such an order was issued, it was certainly negligence in the telegraph operator and Grady, appellant's conductor, not to deliver it to him before the collision. The only question is whether appellant made any proof of that fact or not. It appears to have had reference to the movements of appellant's

train and the double-header, and purports to have been from the train dispatcher to Keiffer and his conductor. Keiffer says that he never received it. The best evidence we have comes from the attorneys for the Company. They say in their brief that it is a fake. We do not know; but under the circumstances they ought to have testified and have questioned Grady, the conductor, on the subject while he was on the witness stand and introduced the dispatcher or shown the reason why. It seems to me that appellant introduced at least a scintilla of evidence showing that this message was sent. But conceding that this message was a fake and there was not the slightest evidence that it was issued, still, the fact appears that the train dispatcher and telegraph operators from Bowling Green to Tennessee Ridge knew of the delayed and crippled condition of second 115 and failed to give appellant any notice of that fact, and appellant testifies that by reason thereof he received his injuries and is supported in this by several uncontradicted witnesses. If this be so, appellee is liable to appellant under the laws of both Tennessee and Kentucky. In the case of Louisville, Cincinnati & Lexington R. R. Co. v. Cavens' Admr., 9 Bush, 559, it appears that Cavens ran his train into a delayed freight train and lost his life, and in considering that case this court said:

"This train on that day was behind time, so far as the proof shows, at all the stations after leaving Lexington, and instead of reaching Eminence at 1:45 p. m., did not reach that place until 5:36 p. m., making it behind its time when leaving there near four hours. After it left Eminence, and before reaching LaGrange, and at a point two and a half miles east of the latter town, in attempting to run an ascending grade, either for the want of steam or on account of the incapacity of the engine, the train failed to ascend, and there remained on the track until it was run into by an extra train, on which the deceased was engineer and Anderson conductor, running in the same direction, resulting in the loss of Cavens' life and much injury to others.    *    *    *

"There were telegraph stations at Frankfort, Bagdad, Eminence and LaGrange, and although the morning freight train, bound for Louisville under the control of Armstrong as conductor was behind time at Frankfort,

Bagdad and Eminence,' and had not reached LaGrange when due at that place by its regular time-table five hours prior to the accident, and these delays all known at the office of the train-dispatcher at Louisville, as well as the fact that this wild-train was then on its way to LaGrange under orders to run as fast as was safe, no information by telegraph or otherwise was given Anderson, the conductor, in order that he might avoid the impeding danger.    *    *    *

"It is not pretended that this train of Anderson's was encroaching upon the time of any other train, and certainly not of the train under Armstrong, as they were both running in the same direction, and when the accident occurred Armstrong's train was five hours behind time. It is also insisted by the company, based upon the same testimony, that the only means that Anderson had of knowing that Armstrong's train was in his way was by seeing it upon the track, or by the signals given, or by making inquiry of persons at the various stations. If this inquiry had been made by Anderson at either Frankfort, Bagdad or Eminence, the response would have been that Armstrong's train was at least an hour in advance of him, as such was the case, and he would have felt entirely secure in making the speed required of him by the order; hence the necessity of communicating to Anderson the facts so essential to the safety of his train and those upon it, and the discharge of so plain a duty would have saved the life of the unfortunate engineer."

The Cavens case is very similar to the one at bar. If the telegraph operators at any of the stations along the route had given appellant notice of the condition of the second section of train No. 115, he could have protected himself, therefore the train dispatcher or operators were certainly negligent in failing to discharge so plain a duty. The depositions offered by appellant and which were rejected on motion of appellee's counsel, were filed as a part of the record on this appeal, and prove the Tennessee law to be, with reference to the question under consideration, the same as the law of Kentucky.

This court decided on the former appeal that, according to the evidence as it appeared on that appeal and the law of Tennessee, the leaky engine and the broken drawhead were not the proximate cause of appellant's inju-

ries; that the negligence of the fellow-servants in charge of the double-header was the proximate cause. We have positive proof in the record now before us that appellee was negligent in furnishing a leaky engine to those in charge of second section of train No. 115 and in requiring them to use it until they arrive at Big Sandy, which was the cause of the delay and injury to appellant. There was proof in the depositions which was rejected by the lower court, to the effect that when several causes are concurrent or help to bring about an injury, for one of which the master is not responsible but is for the other, the master is liable in damages to the servant injured; therefore, appellee's conduct in furnishing the leaky engine rendered it responsible to appellant in damages, although the servants in charge thereof were negligent, as the leaky engine was one of the proximate and concurring causes of the injury. In White's Personal Injuries on Railroads, section 26, it is said:

"So, where two causes combine to produce an injury and both are proximate in their character, the one being the result of negligence of the defendant and the other an occurrence as to which neither the plaintiff nor the defendant was at fault, the defendant would be liable, if the injury would not have happened but for his negligence. And if the injury is the result of two or more causes, all of which can be traceable to the negligence of the defendant, he would be liable therefor and the question of probable or remote cause would not enter into the question. Nor would it defeat the plaintiff's action that the injury resulted from the concurrent negligence of the defendant and another, for neither of the wrongdoers could relieve himself by setting up the negligence of the other."

This question should, at least, be submitted to a jury under proper instructions, as it is a matter for them to decide. In the case of L. & N. R. R. Co. v. Ewing's Admx., 117 Ky., 624, it is said:

"It is urged by appellant that no instruction should have been given submitting the question of the first conductor's negligence. This contention is based solely upon the ground that that negligence, even if found to exist, was not the proximate cause of the injury. So the question is at least, was the negligence of the conductor of the other train so remote as that, as a matter of law, the court should have instructed the jury that they could

not consider it? If there be doubt as to whether the injury was the result of a particular act or of another closer connected, or if there be doubt whether there was or was not an intervening and independent agency between the original act and the injury, that is, where different minds may draw different conclusions from the fact, the question whether the injury is the proximate result of the causes complained of, we say unhesitatingly, should be submitted to the jury for determination.
*   *   * Sometimes it is a very difficult thing to say just what was a proximate cause of a result. It is, therefore, the rule, in determining upon such a fact, to leave it to the jury, who from experience and observation in such matters are thought to be best able to satisfactorily solve it."

See also the case of the City of Louisville v. Hart's Admr., opinion delivered April 17, 1911.

My reasons for dissenting from the original opinion were as follows: It was said in that opinion that the disabled engine was not the proximate cause of Keiffer's injuries. While it was not the only cause of his injuries, it was a concurrent cause. Another reason was that I believed the court misconstrued the Dillard case when it said that according to it the crew on appellant's train were, under all circumstances, fellow-servants to the crew in charge of the train collided with. The law of Tennessee makes exceptions to the rule that a crew in charge of one train are fellow-servants to those in charge of another, and I believe the facts in the case at bar make it fall within one of those exceptions. The law of both Tennessee and Kentucky is to the effect that it is the duty of the master to furnish the servant a reasonably safe place to work and reasonably safe appliances with which to perform his labor. When appellee in the case at bar furnished its servants the leaky engine on second 115, which together with the broken draw-head at Big Sandy caused ten or twelve cars on the rear of the train to become immovable, thereby created an obstruction upon the track. Under this state of facts the law of Tennessee, both before and since the Dillard case, makes the conductor, Rainey, in the case at bar, of the disabled and delayed train, the vice-principal, that is, he represented the master for the time being in providing the other employes, Keiffer in this case, a safe track upon which to operate their trains. This matter was decided by this court with

reference to the Tennessee law in the case of C., N. O. & T. P. Ry. Co. v. Curd, 133 Ky., 138. In that case the facts appeared, in substance, to be as follows: A freight train ran onto a siding so fast that when it struck a flat car standing thereon, it knocked a large piece of iron off of it onto the main track; and a passenger train which was about due and arrived at that point within a few minutes thereafter, ran into it and the fireman on the passenger train was killed. The administrator of the fireman sued the railroad company and it defended upon the ground that the crews of both trains were fellow-servants, and it was, therefore, not liable in damages for the death of the fireman, Curd. His administrator, however, recovered a judgment from which the company appealed and this court decided that the Tennessee law, as proved, made the conductor of the freight train which ran onto the side track and knocked the piece of iron onto the main track, a vice-principal of the master; that is, he took the place of the master for the time being for the purpose of seeing that the track was cleared and made safe for Curd's train to go by, or to give notice to those in charge of the passenger train of the obstruction, and that as he failed to do this, he was guilty of negligence which rendered the company responsible in damages. Rainey, the conductor of the disabled and delayed train in the case at bar, according to the law as announced in the Curd case, became the vice-principal and represented the company, as soon as his train became unable to move, and he should have taken the necessary steps to protect Keiffer and his train; therefore, as he failed to do this, as shown by the evidence in this case and as found in the former opinion, the railroad company is liable in damages. See also the case of I. C. R. R. Co. v. Cooper, et al., which was filed by the Tennessee Supreme Court June 25, 1910. It appears from that opinion that Cooper lost his leg under the following circumstances: He was a fireman on a train and was ordered by his engineer to go between the engine and tender to adjust the air hose, and while in that position another train of cars ran against his train and moved it over one of his legs, cutting it off. According to the former opinion in the case at bar, Cooper was injured by a fellow-servant and not entitled to recover of the master, and this was one of the defenses made by the railroad company. It further appears from the opinion in that case that Priddy was a

foreman of a switching crew and was ordinarily considered a fellow-servant of Cooper, but when the air hose on Cooper's train needed adjusting and Cooper was attending to it, as it was his duty to do, a different state of case arose. The court said that under these circumstances Priddy had an additional duty; that he stood in the place of the master, performing the work incumbent upon him, and that his negligence was the negligence of the master; and referred to the case of Freeman v. R. R. Co., 107 Tenn., 340, in which it appears that Freeman's intestate was with a bridge crew engaged in loading heavy logs upon a flat car, which obstructed his view of an approaching freight train which backed down to couple to the front cars and struck them with an impact so violent that they ran against the flat car and killed Freeman's intestate. That case was decided by the Tennessee court in favor of Freeman, and several opinions are cited to support the conclusion reached in that case. Under the former opinion in this case Freeman's intestate and those in charge of the freight train would have been regarded as fellow-servants and no recovery could have been had. My conclusion is that appellant, under the facts of this case, is entitled to recover; first, on account of the leaky engine, which was one of the concurrent causes of his injuries; second, Rainey, the conductor of the disabled and delayed train, represented the master from the moment the track became obstructed for the purpose of seeing that it was made safe for the passage of Keiffer's train; third, the dispatcher of trains or the operators were negligent in failing to give Keiffer information of this disabled and delayed train ahead of him, and the conductor of Keiffer's train was also negligent if he received the message with reference to this leaky engine and failed to notify him of it. All these facts were shown by the depositions which the lower court refused to allow to be read on the last trial.

One of the surprising statements in the opinion delivered today is as follows:

"Upon the last trial the evidence as to how the collision occurred was practically the same as upon the former trial."

Again:

"Under the former opinion, plaintiff, in order to have his case submitted to the jury, must have presented either a different state of facts, or shown that the law

of the State of Tennessee upon the same state of facts was different from what it was proven on the former trial.''

Appellee introduced no evidence upon the last trial. The law of Tennessee was not proved upon the last trial, and as appellee had made allegations with reference thereto, which were denied, it was its duty to prove it. The facts proved on the last trial were very different from those proved on the former trial, and there was nothing showing that appellant was guilty of contributory negligence. If the depositions offered by appellant on the last trial had been admitted, the testimony would have been very different as to the law of Tennessee from what it was shown to be on the former.

It appears from the opinion that this court recognizes the propriety and right of a court to examine records not in evidence and to consider facts found there in determining whether or not a peremptory instruction should be given. I have always been advised and believed that a court in passing upon such matters should consider alone the testimony introduced, and that the law of other states, when relied upon either for a cause of action or as a defense, should be pleaded and proved as any other fact; and how this court arrived at the conclusion that the testimony in the three rejected depositions was, in substance, the same as the proof on the former trial, is beyond my comprehension.

For these reasons, I dissent.